**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| CCX, Inc., | Case No. 22-10252 (JTD) |
| Debtor.[1] | **Hearing date: April 25, 2022 at 2:00 p.m.**<br>**Objection deadline: April 18, 2022 at 4:00 p.m.** |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING (I)(A) THE DEBTOR'S ENTRY INTO STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS; (B) THE BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING, ASSUMPTION PROCEDURES, AND AUCTION RESULTS, AND (E) DATES FOR AN AUCTION AND SALE HEARING, (II)(A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES, AND (B) THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtor ("Debtor") hereby moves (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") (a) authorizing the Debtor to enter into and perform under an asset purchase agreement, dated March 24, 2022 (the "Stalking Horse Agreement", a copy of which is submitted herewith), between the Debtor and Braeburn Alloy Steel LLC (the "Stalking Horse Bidder" or "Braeburn Alloy"), subject to the solicitation of higher or better offers for the Debtor's assets (the "Assets"); (b) approving the Bid Protections (defined below) granted to the Stalking Horse Bidder; (c) approving the proposed bidding procedures attached as **Exhibit 1** to the Bidding Procedures Order (the "Bidding Procedures"); (d) approving procedures for assuming and assigning executory contracts and

---

[1] The last four digits of the Debtor's federal tax identification number are 6334. The Debtor's address is 101 Braeburn Road, Lower Burrell, PA 15068.

unexpired leases and certain related notices, including notice of proposed cure amounts; (e) approving the form and manner of (1) notice of the Auction (defined below) and Sale Hearing (the "Sale Notice"), attached as **Exhibit 2** to the Bidding Procedures Order; and (2) notice of the Assumption Procedures (the "Assumption Notice"), attached as **Exhibit 3** to the Bidding Procedures Order, which shall also include information regarding the Stalking Horse Bidder's adequate assurance of future performance; (f) establishing dates and deadlines in connection with the sale of substantially all of the Debtor's Assets (the "Sale"), including the Bid Deadline (as defined in the Bidding Procedures), and the dates of the auction for the Assets (the "Auction"), if needed, and the hearing with respect to the approval of the sale (the "Sale Hearing"); and (g) granting related relief.

## PRELIMINARY STATEMENT

1.      The Debtor commenced this chapter 11 case to implement a value-maximizing transaction through a sale of substantially all of its assets.  The Debtor files these proposed bidding procedures with a "stalking horse" bid in hand to set the floor and approve a postpetition marketing and auction process that will yield the highest or otherwise best bid.  Importantly, the Stalking Horse Bid contemplates a going-concern transaction, which will inure to the benefit of all stakeholders, including the Debtor's current employees, vendors, and customers.

2.      In order to capitalize on the opportunity presented by the proposed going-concern transaction and to avoid the value-destructive consequences of a protracted stay in chapter 11, the Debtor believes it is critical that the sale process be consummated on the timeline set forth herein. Competition of the sale process on the contemplated timeline is also essential to preserve the Debtor's cash on hand and liquidity in lieu of obtaining debtor-in-possession financing.  The

proposed sale timeline was specifically designed to balance the goals of (a) running a robust marketing process and (b) minimizing any potential business disruption.

3.      The proposed sale process is the product of substantial discussions and planning by the Debtor.  As more fully described in the *Declaration of Francis x. Feeney in Support of the Debtor's Chapter 11 Petition and First Day Motions* (Docket No. 8), which is incorporated herein in full to support this Motion, the Debtor is facing increasingly dire liquidity challenges, and the operational difficulties flowing therefrom.  The Debtor engaged its professionals regarding possible restructuring alternatives to right-size the balance sheet and maximize the benefits to stakeholders.  As set forth in the Declaration of Matt LoCasio offered in support of this Motion, the terms of which are incorporated herein in full, SC&H Group ("SC&H Capital") commenced its marketing process.  The good faith efforts culminated in the negotiation of a sale of substantially all of the Debtor's assets to the Stalking Horse Bidder under the terms of a stalking horse purchase agreement, against which higher or otherwise better offers may be sought, providing a clear path to consummate a transaction.

4.      The Debtor and the Stalking Horse Bidder have memorialized the terms of the Stalking Horse Purchase Agreement to be a market-tested sale process.  Since at least August 2021 when it retained SC&H Capital as its investment banker, the Debtor has engaged with interested parties and will market test the Stalking Horse Bid to ensure that the Debtor obtains the highest or otherwise best offer or combination of offers for the business or some or all of its assets.

5.      The Debtor requests that the Bidding Procedures Order establish the following dates and deadlines, subject to extension and other modifications by the Debtor:

(i)      **Bid Deadline:** May 3, 2022, at 4:00 p.m. (prevailing Eastern Time), as the deadline by which all Qualified Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

3

(ii) **Auction**: May 4, 2022, at 10:00 a.m. (prevailing Eastern Time), as the date and time of the Auction, if one becomes necessary, which will be held at the offices of the proposed counsel for the Debtor, Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801, in person, telephonically, or by video via Zoom or similar method, or such later time or other place as the Debtor will timely notify all other Qualified Bidders, in consultation with the Subchapter V Trustee;

(iii) **Contract Assumption Notice**. On or prior to April 26, 2022, at 4:00 p.m. (the "Assumption Notice Deadline"), the Debtor shall file with the Court and serve a notice of contract assumption (the "Assumption Notice"), in substantially the form attached hereto as **Exhibit 3**, via overnight delivery on all counterparties to all potential Assigned Contracts (each, a "Counterparty" and, collectively, the "Counterparties"). The Assumption Notice shall include, without limitation, a list of Assigned Contracts (the "Assigned Contract List") that may be assumed and assigned in connection with the Sale and the Cure Payment, if any, that the Debtor believes is required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts, and shall also include information regarding the Stalking Horse Bidder's adequate assurance of future performance. If a Counterparty has any objection to the assumption and assignment of its contract, including if it objects to the Cure Payment or to the Stalking Horse Bidder's adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties a written objection (a "Contract Objection") no later than fourteen (14) days after the date of the Assumption Notice. Service of an Assumption Notice does not constitute an admission that such contract is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtor or a right against the Stalking Horse Bidder (all rights with respect thereto being expressly reserved).

(iv) **Sale Objection Deadline:** May 5, 2022, at 4:00 p.m. (prevailing Eastern Time) as the deadline (the "Sale Objection Deadline") to object to (i) the conduct of the Auction, (ii) the choice of Successful Bidder and/or Back-Up Bidder, (iii) Adequate Assurance Objections with respect to a Successful Bidder and/or Back-Up Bidder, (iv) the Court approving the Sale; and (v) except as otherwise set forth in the Assumption Procedures (defined below), object to the potential assumption or assumption and assignment of the Debtor's executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code (all such contracts and leases capable of being assumed or assumed and assigned under section 365 of the Bankruptcy Code, the "Assigned Contracts") and cure amounts related thereto;

(v) **Reply Deadline**: May 6, 2022, at 4:00 p.m. (prevailing Eastern Time), as the deadline for the Debtor to file replies to any objections to the Sale and/or

4

the assumption or assumption and assignment of the Assigned Contracts and cure amounts related thereto, other than with respect to objections filed after the Sale Objection Deadline;

(vi) **Sale Hearing (if the bidder elects to purchase the assets pursuant to Section 363 of the Bankruptcy Code):** May 9, 2022, at 11:00 a.m. (prevailing Eastern Time) before the Honorable John T. Dorsey, Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, which shall be held in person or via Zoom or similar method pursuant to the Court's video hearing procedures;

6.  To the extent that the Debtor and its advisors secure a higher or otherwise better offer, they reserve their rights to pursue an alternative sale transaction, in accordance with their fiduciary duties. If approved, the proposed Bidding procedures will enable the Debtor to expeditiously sell their assets and emerge from chapter 11 shortly after. As set forth in further detail below, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the related relief requested in this Motion are in the best interest of the Debtor's estate and its stakeholders. Accordingly, the Debtor requests that the Court grant this motion.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105, 363, 365, 503 and 507 of title

11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rule 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

8.    On March 27, 2022 (the "Petition Date"), the Debtor commenced this bankruptcy proceeding in this Court through the filing of a voluntary chapter 11 petition.

9.    The Debtor operates as Braeburn Alloy Steel and its operations are located in Lower Burrell, Pennsylvania on the banks of the Allegheny River.  The Debtor specializes in converting customer owned raw material into forged and rolled products.  The multi-building plant totals 220,000 square feet and utilizes 8.9 acres of the 43 acres of company owned property.

10.    The Debtor employs a handful of non-union employees, primarily operational, administrative and accounting personnel in addition to the unionized employees who remain integral in performing and completing customer orders for the processing of metal alloys, including titanium, refractory metals, high-end nickel alloys, and stainless, tool steel, carbon steel, and alloy steels.  The Debtor and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Serve Workers International Union, AFL-CIO-CLC ("United Steelworkers" or the "Union") are parties to a collective bargaining agreement that is set to expire on or about June 30, 2022.

11.    The Debtor's largest customer is Electralloy.  Approximately forty one percent of the Debtor's revenue is derived from Electralloy.  Electralloy is an affiliate of the Stalking Horse Bidder.  Both Electralloy and the Stalking Horse Bidder are affiliates of G.O. Carlson Inc. (together with its affiliates, "Carlson").  Electralloy's principal place of business is located in Oil City, Pennsylvania, which is located along the Allegheny River approximately 80 miles away.

13504482.v1

12.    Electralloy has continued to support the Debtor both pre and postpetition. Electralloy has continued to utilize the Debtor's services, make timely payment to the Debtor and has even accelerated orders and payment.  The Debtor has been able to maintain its cash flow and continue operations as a going concern despite disruptions resulting from delays and shutdowns from the Covid-19 pandemic and mechanical problems.

13.    In August of 2021, the Debtor engaged SC&H Capital to serve as the Debtor's investment bankers.  As provided in its retention, SC&H assisted Debtor's management and assessed the Debtor's restructuring options.  SC&H has worked with the Debtor's management and other professionals in connection with the Debtor's analyses of its business affairs, assets and liabilities, financial position, contracts, and various strategic transactions.  SC&H became familiar with the Debtor's capital structure, liquidity needs, and business operations.

14.    SC&H marketed the Debtors' assets since shortly after its retention.  SC&H's materials were submitted to over 1000 companies as potential likely targets, in addition to 878 groups from SC&H's internal buyers' database which includes private equity groups, family offices, and private investors as well as other groups within the industry.

15.    Over the course of the marketing process, at least twenty-five (25) prospective buyers executed confidential agreements and received SC&H's confidential executive summary ("CES").  Of those potential buyers, four (4) visited the facilities and conducted onsite diligence.

16.    After several months of negotiation and diligence, including substantive environmental diligence, Carlson submitted a non-binding letter of intent which was accepted by the Debtor.  The Debtor and Carlson then negotiated a term sheet (the "Stalking Horse Term Sheet") and finally on an asset purchase agreement that resulted in the Stalking Horse Agreement.

7

17.     As provided in the Stalking Horse Agreement and further described herein, the proposed sale contemplates a transfer of all or substantially all of the Debtor's assets in exchange for $1,500,000 in cash, plus certain assumed liabilities.

**RELIEF REQUESTED**

## I.     SUMMARY OF KEY TERMS OF THE STALKING HORSE BID

18.     By this Motion, the Debtor is requesting approval of the designation of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse Agreement, as well as approval of reasonable and customary Bid Protections.

19.     The Stalking Horse Bidder is the Debtor's largest customer, and its business accounts for over 41% of Debtor's sales this fiscal year . The Stalking Horse Bidder has spent a significant amount of time and money conducting due diligence on the environmental situation at Debtor's steel mill facility, which has been in continuous operation for well over 100 years.

20.     The bid protections contemplated in the Stalking Horse Agreement consist of a break-up fee equal to 3% of the total amount under the Stalking Horse Bid, plus up to $50,000 in reimbursement of actual expenses (the "Bid Protections"). The Stalking Horse Bidder will receive the Bid Protections only if it is not the Successful Bidder.

21.     The Bid Protections shall be payable from the proceeds of a Sale to a higher or better bidder (if any), in the event that the Stalking Horse Bidder is not selected as the Successful Bidder. Given the Debtor's need to maximize the value of the Assets through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bid and offer Bid Protections is justified, appropriate and essential.

22.     In accordance with Local Rule 6004-1(b), the pertinent terms of the Stalking Horse Agreement are summarized in the following table.[2]  The Debtor respectfully submits that the terms of the Stalking Horse Agreement, including those required to be highlighted under Local Rule 6004-1(b) are fair, reasonable, and appropriate under the circumstances, in light of the parties' good faith, arm's-length negotiation of the Stalking Horse Bid.  The Debtor's entry into the Stalking Horse Agreement results substantial benefits that the Debtor and its estate, including the establishment of a baseline price for the Debtor's assets as well as an option that permits an ongoing business enterprise.

| TERM SHEET | |
|---|---|
| **Parties** | Seller: CCX, Inc. ("Debtor")<br><br>Buyer: Braeburn Alloy Steel LLC, or its designee, or a party that submits a bid materially higher than the Qualified Bid.<br><br>*See* Stalking Horse APA |
| **Purchase Price** | "Purchase Price" shall be equal to cash in the amount of $1,500,000 on the Closing Date.  Subject to the satisfaction of the conditions precedent and the covenants, representations and warranties of Seller as set forth in this Agreement, on the Closing date Buyer shall pay the Purchase Price to Seller in immediately available funds pursuant to the wire instructions provided by Seller.<br><br>*See* Stalking Horse APA, Article I, Section 1.06. |
| **Purchased Assets** | Subject to the terms of the APA, the assets shall include all or substantially all of the Debtor's assets.<br><br>*See* Stalking Horse APA, Article III, Section 3.07. |
| **Closing Conditions** | *See* Stalking Horse APA, Article VIII. |
| **"Insider" Status of Stalking Horse Bidder** Local Rule 6004-1(b)(iv)(A). | The Stalking Horse Bidder is not an insider of the Debtor. |
| **Agreements with Management or Key Employees** | The Stalking Horse Bidder has not entered into any agreements with management or key employees concerning compensation or future employment. |

---

[2]  This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Term Sheet.

13504482.v1

| TERM SHEET | |
|---|---|
| Local Rule 6004-1(b)(iv)(B) | |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | The proposed APA contemplates that the Sale shall be implemented pursuant to a bid and auction process or in connection with confirmation through either a motion pursuant to section 363 or of a Chapter 11 plan. <br><br> *See* Stalking Horse APA |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | May 11, 2022 is defined as the "Outside Date" in the Stalking Horse Term Sheet. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | Absent a Plan, the Stalking Horse Bidder and the Debtor do not seek to have the sale of the Assets in the Stalking Horse Bid declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Debtor expects the proposed Sale Order to include a customary finding concerning the absence of successor liability for the Buyer. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The APA does not contemplate a credit bid. <br><br> *See* Stalking Horse APA |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Debtor is seeking a waiver of Bankruptcy Rule 6004(h)'s stay in connection with the Bidding Procedures Order as well as a waiver of Bankruptcy Rule 6006(d). <br><br> *See* Proposed Bidding Procedures Order, ¶¶ 30-31 |

## II.    THE BIDDING PROCEDURES

23.    The Bidding Procedures are designed to facilitate a fair, robust and competitive sale process to ensure that the value of the Assets is maximized. The Bidding Procedures allow the Debtor to solicit and evaluate bids from potential bidders and determine the highest or otherwise best offer for their Assets on a timeline that is consistent with the timeline for these chapter 11 cases. Specifically, the Debtor believe the Bidding Procedures will be sufficient to allow potential bidders to conduct diligence and formulate competing bids given that there was a robust pre-petition marketing process.  As of the date hereof, the Debtor has re-commenced the prepetition marketing process and has already made contact with numerous parties that expressed interest in submitting a bid prepetition.

13504482.v1

24.     Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding

Procedures are highlighted in the chart below:[3]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | | |
|---|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br>Local Rule 6004-1(c)(i)(A)-(B) | **A.** | **Bid Deadline** – the Bid Deadline to submit a binding and irrevocable offer to acquire the Assets is **May 3, 2022 at 4:00 p.m. prevailing Eastern time (Bid Procedures, Section C).** |
| | **B.** | **Diligence Access Requirements** – To access the Debtor's data room and participate in the sale process, a Potential Bidder must submit:<br><br>• a confidentiality agreement on customary terms that are reasonably acceptable to the Debtor;<br><br>• sufficient evidence, as reasonably determined by the Debtor in consultation with the Subchapter V Trustee, that the bidder intends to obtain due diligence and participate in the sale process for a bona fide purpose consistent with the Bidding Procedures; and<br><br>• evidence of such Potential Bidder's financial capability to acquire the Assets, the adequacy of which will be assessed by the Debtor (with the assistance of its advisors). (**Bid Procedures, Section B**) |
| | **C.** | **Qualified Bid Requirements** - To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtor and its advisors, a written, irrevocable offer that must be determined by the Debtor, in its reasonable business judgment and in consultation with the Subchapter V Trustee, to satisfy each of the following conditions (collectively, the "Bid Requirements"):<br><br>• **Purpose**. Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase some or all of the Assets, and identify the Assets with reasonable specificity and the particular liabilities, if any, the Potential Bidder seeks to assume.<br><br>• **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the Assets (the "Purchase Price") and must (a) indicate the source of cash consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies, and (b) identify separately the cash and non-cash components of the Purchase Price, which non-cash components shall be limited only to credit-bids and assumed liabilities. The Bid should include a detailed sources and uses schedule. The Purchase Price must include, unless otherwise |

---

[3] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Bidding Procedures.

13504482.v1

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | agreed by the Stalking Horse Bidder in its sole discretion with respect to items (i) and (ii) below, (i) cash in the amount of $1,500,000 less (ii) all outstanding Loans on the Closing Date. Subject to the satisfaction of the conditions precedent and the covenants, representations and warranties of Seller as set forth in this Agreement, on the Closing date Buyer shall pay the Purchase Price to Seller in immediately available funds pursuant to the wire instructions provided by Seller. |

- **Minimum Bid**. The value of each Bid for all or substantially all of the Debtor's Assets, as determined by the Debtor in its business judgment (in consultation with the Subchapter V Trustee), must exceed (a) the Purchase Price, plus (b) the maximum amount of Bid Protections payable to the Stalking Horse Bidder, plus (c) the minimum Bid increment of $50,000.[4]

- **Bid Deposit.** Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid (the "Good Faith Deposit").

- **Sale/Plan Sponsor Transaction**. Each Bid must be accompanied by an election by such bidder regarding whether the Bid will be consummated pursuant to an order under section 363 of the Bankruptcy Code (a "363 Sale"), or pursuant to a plan of reorganization (a "Plan").

- **Committed Financing**. If a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtor's satisfaction, in consultation with the Subchapter V Trustee, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations (including any assumed liabilities) under its Bid. Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants, conditions and term and termination provisions acceptable to the Debtor, in consultation with the Subchapter V Trustee.

- **Good Faith Offer**. Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.

- **Marked Agreement**. Each Bid that elects a 363 Sale must be accompanied by clean and duly executed transaction documents

---

[4] The Debtor, after consultation with the Subchapter V Trustee, reserves the right to alter the minimum Bid increments, and such minimum Bid increments may include the assumption of liabilities.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreements marked to reflect any amendments and modifications from the Stalking Horse Agreement and any other applicable transaction documents relating to the Stalking Horse Bid, which amendments and modifications may not be inconsistent with these Bidding Procedures.<br><br>Each Bid that elects to close pursuant to a Plan must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft plan and disclosure statement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid, along with redlines of such agreements marked to reflect any amendments and modifications from the form plan and form disclosure statement (the "Form Plan Documents"), which amendments and modifications may not be inconsistent with these Bidding Procedures.<br><br>The documents contemplated by this Section shall herein be referred to as the "Qualified Bid Documents."<br><br>• **Contracts and Leases; Employees**. Each Bid must identify an initial schedule, of each executory contract and unexpired lease to be assumed and assigned to the Potential Bidder in connection with the Sale. Each Bid must identify with specificity (i) the party responsible for satisfying cure amounts and other amounts that have accrued under assumed and assigned contracts and leases after the Petition Date and prior to Closing, including amounts that have accrued but not yet become due prior to the Closing, (ii) the Debtor's leases to be assumed and assigned to the Potential Bidder; and (iii) which of the Debtor's employees or groups thereof will be offered employment with the Potential Bidder to the extent it is the Successful Bidder and Closing occurs.<br><br>• **No Contingencies**. A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approvals (including regulatory approvals), and/or (c) the outcome or completion of a due diligence review by the Potential Bidder.<br><br>• **Binding and Irrevocable**. A Potential Bidder's Bid must be irrevocable unless and until the Debtor accepts a higher Bid and such Potential Bidder is not selected as the Back-Up Bidder (as defined herein). In the event a Bid is chosen as the Back-Up Bid (as defined below), it must remain irrevocable until the Debtor and the Successful Bidder consummates the Sale. |

13

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

- **Joint Bids**. The Debtor will be authorized to approve joint Bids in its reasonable discretion, in consultation with the Subchapter V Trustee, on a case-by-case basis.

- **Adequate Assurance Information**. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtor, in consultation with the Subchapter V Trustee, that such Potential Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets covered by the Bid (the "Closing"), and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform, under any contracts that are proposed to be assumed and assigned to such party.

- **Identity**. Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtor, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any officer, director, or equity security holder of the Debtor.

- **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors and, if required, its shareholders (or a comparable governing body reasonably acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

- **No Fees**. Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bid: (a) each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction; (b) by submitting its Bid, each Potential Bidder agrees to waive its right to request or receive fees or reimbursement of expenses on any basis, including under section 503(b) of the Bankruptcy Code; and (c) each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
| --- |

|  | • **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder, if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable assets.<br><br>• **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals (and in the case that receipt of any such approval is expected to take more than thirty days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).<br><br>• **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Debtor's Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets.<br><br>• **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtor in consultation with the Subchapter V Trustee, but in no event later than May 11, 2022.<br><br>• **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, Auction, construction, and enforcement of these Bidding Procedures, any plan, the Sale documents, and the Closing, as applicable.<br><br>Bids fulfilling all of the preceding requirements, as determined by the Debtor and its advisors, in its reasonable business judgment and in consultation with the Subchapter V Trustee, will be deemed to be "Qualified Bids," and those parties submitting Qualified Bids will be deemed to be "Qualified Bidders." All information disclosed by any Potential Bidder in |

13504482.v1

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | connection with all of the preceding requirements will be made available by the Debtor; *provided* that the Debtor shall provide the Stalking Horse Bidder with the number of Qualified Bids received and the amount of each respective Qualified Bid.<br><br>In the event that the Successful Bid is to be effectuated through a plan of reorganization, all deadlines after the Auction, including the Sale Hearing, shall be suspended, and the Debtor will request that the Bankruptcy Court schedule all necessary deadlines in order to have such plan of reorganization confirmed at any confirmation hearing as set forth herein (subject to the availability of the Court) and the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | If the Stalking Horse Bidder is not the Successful Bidder, it will receive a payment of a break-up fee equal to 3.0% of the total amount (including anticipated draws) under the Stalking Horse Agreement, plus an expense reimbursement of up to $50,000. |
| **Modification of Bidding and Auction Procedures**<br>Local Rule 6004-1(c)(i)(D) | • The Debtor reserves the right, in consultation with the Subchapter V Trustee, to alter the $50,000 overbid increment under the Bidding Procedures. **(Bid Procedures, Section F)**<br><br>• The Debtor reserves the right, in its reasonable business judgment and in consultation with the Subchapter V Trustee, to adjourn the Auction one or more times. **(Bid Procedures, Section F)** |
| **Closing with Alternative Back- Up Bidders**<br>Local Rule 6004-1(c)(i)(E) | If for any reason the Successful Bidder or Successful Bidders fail to consummate the Qualified Bid or Qualified Bids within the agreed upon time permitted as set forth in the order approving Sale to the Successful Bidder or Successful Bidders, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid or Bids for the applicable Assets (each, a "<u>Back-Up Bidder</u>"), will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, a "<u>Back-Up Bid</u>"), and the Debtor will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid or Back-Up Bids as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.<br><br>Upon designation of the Back-Up Bidder or Back-Up Bidders at the Auction, the Back-Up Bid or Back-Up Bids must remain open until the Closing of the Successful Bid or Successful Bids, as applicable. **(Bidding Procedures, Section I)** |
| **Provisions Governing the Auction**<br>Local Rule 6004- 1(c)(ii) | If one or more Qualified Bids is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Debtor's Assets. The Auction will commence on **May 4, 2022 at 10:00 a.m.** (prevailing Eastern Time) which will be held at the offices of the proposed counsel for the Debtor, |

13504482.v1

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801, in person, telephonically, or by video via Zoom or similar method or such later time or other place as the Debtor will timely notify all other Qualified Bidders, in consultation with the Subchapter V Trustee.

**Auction Procedures:**

- the Auction will be conducted openly;

- only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction;

- the Qualified Bidders, including the Stalking Horse Bidder, must appear in person, telephonically, or by video via Zoom or similar method, or through duly-authorized representatives at the Auction;

- only the duly-authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Subchapter V Trustee, and the Debtor's union will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtor, in consultation with the Subchapter V Trustee, may permit such party to attend the Auction;

- prior to the Auction, the Debtor and its advisors, in consultation with the Subchapter V Trustee, will evaluate Qualified Bids and identify the Qualified Bid that is the highest or otherwise best Bid (the "<u>Starting Bid</u>");

- the bidding at the Auction will begin at the Starting Bid;

- subsequent Bids at the Auction, including any Bids by the Stalking Horse Bidder, must be made in minimum increments of $50,000 of additional value, if applicable;[5]

- each Qualified Bidder will be informed of the terms of the previous Bids and the Debtor shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtor's reasonable business judgment, and in consultation with the Subchapter V Trustee, the highest or otherwise best bid(s) for the applicable Assets;

- the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

---

[5] The Debtor, after consultation with the Subchapter V Trustee, reserve the right to alter the minimum Bid increments, and such minimum Bid increments may include the assumption of liabilities.

13504482.v1

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | • each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale<br><br>• the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid;<br><br>• the Debtor, after consolidation with the Subchapter V Trustee, reserves the right, in its reasonable business judgment to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtor and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment and in consultation with the Subchapter V Trustee, may require to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and<br><br>• the Auction will be governed by such other Auction Procedures as may be announced by the Debtor and its advisors, after consultation with the Subchapter V Trustee, from time to time on the record at the Auction; provided that such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtor, in good faith and in consultation with the Subchapter V Trustee, to further the goal of attaining the highest or otherwise best offer for the Assets.<br><br>To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor, in its reasonable business judgment and in consultation with the Subchapter V Trustee, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Asset. |

18

## III.    THE BID PROTECTIONS

25.    To induce the Stalking Horse Bidder to expend the time, energy and resources necessary to negotiate and ultimately execute the Stalking Horse Agreement and to keep the Stalking Horse Bid memorialized therein open and irrevocable through the Debtor's competitive auction process, the Debtor has agreed to provide the Stalking Horse Bidder with, and seek this Court's approval of, certain protections pursuant to the terms of the Stalking Horse Agreement.

26.    The Stalking Horse Agreement provides for the payment to the Stalking Horse Bidder of Bid Protections equal to 3% of the total amount, plus an expense reimbursement up to $50,000, if the Sale results in net proceeds in excess of the Stalking Horse Bid.  The Stalking Horse Bidder shall be entitled to receive the break-up fee and expense reimbursement only if it is not the Successful Bidder.

## IV.    FORM AND MANNER OF SALE NOTICE

27.    As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtor will serve the Sale Notice upon the following parties or its respective counsel, if known (collectively, the "Notice Parties"): (a) the Subchapter V Trustee; (b) the U.S. Trustee for the District of Delaware; (c) the Stalking Horse Bidder, (d) the Union, (e) any parties known or reasonably believed to have expressed an interest in the Debtor's assets; (f) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtor's assets; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.

28.    The Debtor submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the dates and deadlines related to the Sale Hearing; and (d) instructions for

promptly obtaining a copy of the Stalking Horse Agreement, Bidding Procedures, and Bidding Procedures Order. Accordingly, the Debtor request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction or Sale Hearing is required.

## V.     ASSUMPTION PROCEDURES

29.     To facilitate the Sale, the Debtor seek authority to assume and assign executory the Assigned Contracts designated by the successful bidder to be assumed and assigned to the successful bidder.  The Debtor seek authority to assume and assign the Assigned Contracts to the successful bidder in accordance with the assumption and assignment procedures set forth below (the "Assumption Procedures").  The Assumption Procedures are as follows:

a.      On or prior to April 26, 2022, at 4:00 p.m., (the "Assumption Notice Deadline"), the Debtor shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assigned Contract the Assumption Notice.

b.      The Assumption Notice shall include, without limitation, a list of Assigned Contracts (the "Assigned Contract List") that may be assumed and assigned in connection with the Sale and the cure amount (each, a "Cure Cost"), if any, that the Debtor believes is required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts. If a Counterparty has any objection to the assumption and assignment of its contract, including if it objects to the Cure Cost or to the Stalking Horse Bidder's adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined in the Bidding Procedures Order) a written objection (a "Contract Objection") on or before fourteen (14) days after the date of the Assumption Notice.

c.      Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (iii) be filed with the Clerk of the Court on or before the Sale Objection Deadline, except as otherwise set forth below with respect to Assigned Contracts added to the Assigned Contracts List (or for which the proposed Cure Cost is modified) after the Assumption Notice Deadline; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

d.      Any time after the Assumption Notice Deadline and before the date one (1) business day prior to the Sale Hearing, the Debtor reserves the right, and are authorized but

20

not directed, to (i) add previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a successful bidder in accordance with the definitive agreement for the Sale, (ii) remove an Assigned Contract from the Assigned Contract List that a successful bidder proposes be assumed and assigned to it in connection with the Sale, or (iii) modify the previously stated Cure Cost associated with any Assigned Contract.

e.      If, after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtor is determined to be Assigned Contracts in connection with the Sale or previously stated Cure Costs are modified, as soon as practicable thereafter and in no event less than one (1) business day before the date of the Sale Hearing, the Debtor shall file with the Court and serve, by overnight delivery, on the applicable Counterparties a supplemental or revised Assumption Notice, and such Counterparties shall file any Contract Objections on the later of: (a) the Sale Objection Deadline and (b) fourteen (14) days from date of service of the Assumption Notice.  In the event that such supplemental or revised Assumption Notice was filed and served less than fourteen (14) days prior to the commencement of the Sale Hearing and an objection is filed that is not otherwise consensually resolved, then such objection will not be adjudicated at the Sale Hearing and will be set for a subsequent hearing.

f.      At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to the successful bidder of only those Assigned Contracts that have been selected by the successful bidder to be assumed and assigned (collectively, the "Selected Assigned Contracts"). The inclusion of an Assigned Contract on an Assumption Notice will not (a) obligate the Debtor to assume any Assigned Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtor that such Assigned Contract is an executory contract. The Debtor and its estate reserves any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

g.      If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtor and assignment to successful bidder of the Selected Assigned Contract, and be forever barred from asserting any objection with regard to such assumption or assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the successful bidder); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Assumption Notice for such Selected Assigned Contract; and (iii) the Cure Cost set forth in the Assumption Notice for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtor and its estate, the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order.

h.      To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a

"Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; *provided, however*, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtor and assigned to the Successful Bidder.

30.     Any party failing to timely file a Contract Objection with respect to the assumption and assignment of any Assigned Contract or related Cure Cost specified on an Assumption Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtor or any of the Debtor's estates, or the successful bidder, and shall be deemed to consent to the Sale and the assumption and assignment of such Assigned Contract assumed and assigned in connection therewith.

31.     To provide the Counterparties with information concerning the successful bidder and any back-up bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the successful bidder/back-up bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than one (1) business day before the date of the Sale Hearing, the Debtor shall file with the Court and serve on all Counterparties a notice containing the results of the Auction, which to the extent the Stalking Horse Bidder is not the successful bidder, shall provide information regarding adequate assurance of future performance.

## BASIS FOR RELIEF

### I.     THE RELIEF SOUGHT IN THE BIDDING PROCEDURES ORDER, INCLUDING ENTRY INTO THE STALKING HORSE AGREEMENT IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND SHOULD BE APPROVED

32.     Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use,

sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

33.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

34.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

35.     After an extensive prepetition marketing process, the Debtor has carefully designed a post-petition process that it believes will maximize the value of its estate, produce maximum recoveries, and result in a successful sale of the estate. This process includes both entry into the Stalking Horse Agreement, to set a baseline bid for the auction, and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for the Debtor's assets.  The Debtor is confident that the Bidding Procedures will allow the Debtor to solicit additional offers and conduct its sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package of consideration for the assets and who can demonstrate the wherewithal to take on the assets, obligations, and liabilities being transferred. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

36.     The Debtor respectfully submits that the Stalking Horse Agreement and the Bidding Procedures will encourage robust bidding for the assets and are appropriate under, and consistent with, the relevant standards governing overbid processes in bankruptcy proceedings.  Accordingly, the Debtor respectfully submits that the Stalking Horse Agreement and the Bidding Procedures should be approved.

## II.     APPROVAL OF THE BID PROTECTIONS IS APPROPRIATE

37.     The Debtor believes that the Bid Protections are fair and reasonable under the circumstances. The Bid Protections provided for in the Stalking Horse Agreement were negotiated at arms' length and in good faith and were a necessary inducement to the Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.  As discussed below, the Stalking Horse Bid sets a "floor" value for the Assets

that maximizes the likelihood that the Debtor will receive the highest or otherwise best offer for the Assets to the benefit of the Debtor's estates.

38.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two (2) instances in which bid protections may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *See id.; see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

39.     In *O'Brien*, the Third Circuit reviewed the following nine (9) factors set forth by the lower court as relevant in deciding whether to award a termination fee:

(a)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(b)     whether the fee harms, rather than encourages, bidding;

(c)     the reasonableness of the break-up fee relative to the purchase price;

(d)     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

(e)     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

(f)     the correlation of the fee to a maximum value of the debtor's estate;

(g)     the support of the principal secured creditors and creditors' committees of the break-up fee;

(h)     the benefits of the safeguards to the debtor's estate; and

(i)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

40.     While none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtor's estates because they will enable the Debtor to establish an adequate floor value for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtor's estates.  The Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction.  Without the Bid Protections, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the Purchase Price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids.  Therefore, without the benefit of the bid of the Stalking Horse Bidder, the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

41.     In addition, payment of the Bid Protections in the context of a sale to another purchaser will not diminish the Debtor's estates to the extent they become payable, as the Bidding

Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Bid Protections.

42.     Accordingly, based on the foregoing, the Debtor submits that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

## III.    THE ASSUMPTION PROCEDURES SHOULD BE APPROVED

43.     In connection with the assumption and assignment of certain Assigned Contracts, the Debtor believes it is necessary to establish a process by which (a) the Debtor and counterparties to Assigned Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such counterparties can object to the assumption and assignment of the Assigned Contracts and/or related cure amounts.

44.     As set forth in the Bidding Procedures Order, the Debtor also requests that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to (a) the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code and (b) assignment notwithstanding any anti-alienation provision or other restriction on assignment. *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

45.     The Debtor believes that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtor requests the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## IV.  THE FORM AND MANNER OF THE SALE NOTICE SHOULD BE APPROVED

46.  Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of an auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the proposed auction and the deadline for filing any objections to such a sale.

47.  As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice to be served upon the Notice Parties.

48.  The Debtor submits that the Sale Notice, which includes information concerning the "free and clear" nature of the Sale, the Bidding Procedures, the Stalking Horse Bid and other material information, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 6004-1.  Accordingly, no further notice is necessary and the Debtor requests that this Court approve the form and manner of the Sale Notice.

49.  In addition, to provide the Counterparties with information concerning the successful bidder and any back-up bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the successful bidder/back-up bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction, which to the extent the Stalking Horse Bidder is not the successful bidder, shall provide information regarding adequate assurance of future performance, and in no event less than one (1) business day before the date of the Sale Hearing, the Debtor shall file with the Court and serve on all Counterparties a notice which details the outcome of the Auction.  The Debtor submits that such service of the post-auction notice is proper and sufficient to timely and proper notice that the Debtor will proceed with assumption and assignment of the Assigned Contracts in connection with the Sale. Accordingly, the Debtor requests that this Court approve the manner of notice of the post-auction notice.

13504482.v1

V.    **APPROVAL OF THE SALE IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR'S ESTATES**

    A.    **The Sale Should Be Approved as an Exercise of the Debtor's Sound Business Judgment**

50.    Bankruptcy Code section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of its assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification." *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).

51.    Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (". . . a presumption of reasonableness attaches to a Debtor's management decisions").

52.    The Debtor has a sound business justification for running a competitive bidding process for the sale of the Assets consistent with the Bidding Procedures. The competitive bidding process will ensure that the Debtor obtains the best possible value for its assets, for the benefit of the Debtor's estate. As such, the Debtor's determination to run a competitive bidding process for

the sale of the Assets as provided for in the Bidding Procedures is a valid and sound exercise of the Debtor's business judgment.

**B.      Adequate and Reasonable Notice of the Sale Will Be Provided**

53.      As set forth above, the Sale Notice (a) will be served in a manner that provides parties with notice of the date, time, and location of the Auction and the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale, and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest, and, as such, the Debtor is confident that the Sale Notice will be properly vetted by the time of service thereof.

**C.      The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Each Be a "Good Faith Buyer"**

54.      Pursuant to Bankruptcy Code section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Abbotts Dairies of Penn., Inc*., 788 F.2d 143, 147 (noting to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). (3d Cir. 1986).

55.      In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  *See In re Pursuit Capital Mgmt*., LLC, 874 F.3d 124, 135 (3d Cir. 2017) ("The good faith requirement speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status

at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Dura Auto. Sys., Inc.*, No. 06-11202 KJC, 2007 WL 7728109, at *96 (Bankr. D. Del. Aug. 15, 2007) (same).

56.     The Debtor submits that the successful bidder arising from the Auction (if any), will be a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m) and the terms of any purchase agreement with any successful bidder will be negotiated at arms-length and in good faith without any collusion or fraud.[6] Accordingly, the Debtor will be prepared to show at the hearing to approve any such sale that the successful bidder is entitled to the full protections of Bankruptcy Code section 363(m).

**D.     The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f)**

57.     Bankruptcy Code section 363(f) permits the Debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");

---

[6] Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

13504482.v1

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). The Debtor believes that it will be able to demonstrate at the Sale Hearing that it has satisfied one or more of these conditions.

**E.    Assumption and Assignment of Assigned Contracts Should Be Approved**

58.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (providing assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

59.    Here, a review of relevant facts demonstrates that the Court should approve the decision to assume and assign the executory contracts and unexpired leases in connection with the Sale as a sound exercise of the Debtor's business judgment, consistent with the well-settled standard in this district governing same. The potential Assigned Contracts include those executory contracts and unexpired leases that are necessary to run the Debtor's business. It is unlikely that any purchaser would want to acquire any assets on a going-concern basis unless a significant number of the Assigned Contracts needed to conduct the business and manage the day-to-day

32

operations were included in the transaction. As such, making the potential Assigned Contracts available for assignment is essential to inducing the best offer for the Assets.

60.     Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts by way of the Assumption Procedures should be approved as an exercise of its business judgment.

61.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code that a debtor (a) cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  11 U.S.C. § 365.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *Matter of Luce Indus., Inc*., 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

62.     The Debtor submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied. The proposed Bidding Procedures Order and Assumption Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults, which will afford counterparties a meaningful opportunity to challenge the Debtor's proposed cure amounts.  Once established, the cure amounts will be paid (either by the successful bidder, or the Debtor from the cash proceeds of the sale).  Thus, the Bidding Procedures and Assumption Procedures ensure that all defaults will be cured in connection with the assignment of the Assigned Contracts, as required by section 365(b)(1)(A).

63.     Similarly, the Debtor submits that counterparties will receive adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *Matter of U.L. Radio Corp*., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, the required assurance will fall short of an absolute guarantee of performance. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Luce Indus*., 8 B.R. at 107; *see also In re Great Atl. & Pac. Tea Co., Inc*., 472 B.R. 666, 674 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance.'").

64.     The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of certain Assigned Contracts to the Stalking Horse Bidder (or other successful bidder), will be satisfied at the Sale Hearing.  As required by the Bidding Procedures, the Debtor will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (e.g., financial credibility and willingness and ability of the interested party to perform under the Assigned Contracts). Further, all counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

## **WAIVER OF BANKRUPTCY RULE 6004(A), 6004(H) AND 6006(D)**

65.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h), and the 14-day stay of an order authorizing the debtor to assign an executory contract or lease under Bankruptcy Rule 6006(d).

## NOTICE

66.     Notice of this Motion will be given to: (i) the Office of the United States Trustee, (ii) the Subchapter V Trustee, (iii) counsel for the Stalking Horse Bidder, and (iv) all parties having filed an entry of appearance and request for notice in these cases. The Debtor submit that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter the Bidding Procedures Order, granting the relief requested in this Motion and such other relief as may be just and proper.

Dated:  April 4, 2022
      Wilmington, Delaware

MORRIS JAMES LLP

*/s/ Jason S. Levin*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Sarah M. Ennis (DE Bar No. 5745)
Jason S. Levin (DE Bar No. 6434)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com
E-mail: sennis@morrisjames.com
E-mail: jlevin@morrisjames.com

*Proposed Counsel for Debtor and Debtor in Possession*

13504482.v1